ORIGINAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2014 AUG 25   AM 11: 33

DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| AND STATE OF TEXAS, *EX REL.*, | § | |
| AND LESLIE ANN WILLIAMS, PLAINTIFFS | § | |
| | § | |
| VS. | § | CIV. ACTION NO: 3:12-CV-0371-B |
| | § | |
| MCKESSON CORPORATION | § | |
| D/B/A MCKESSON PROVIDER TECHNOLOGIES, | § | |
| AND DR. STEPHEN LARSON,   DEFENDANTS | § | |

---

**THIRD AMENDED *QUI TAM* COMPLAINT**
**Supporting Documents**

---

August 25, 2014

Honorable Judge Jane J. Boyle
1100 Commerce Street
Room #1452
Dallas, TX 75242

**RE: CIVIL ACTION NO. 3:12-cv-0371-B**

Dear Judge Boyle,

My name is Leslie Ann Williams and I am following the instructions of your Deputy Rod Reynolds to send you yet another letter of concern.

I was informed via email on August 28, my attorney Jude Menes was granted Motion to Withdraw.

After reading the Second and Third Amended Complaints and defendant responses submitted I noticed that yet again the information requested to 'State a Claim' was not included on my behalf.

Judge Boyle, I humbly take this opportunity to ask that you review the attachments and find that my claim does support the FCA for the fact that Stephen Larson, D.M.D. knowingly submitted Medicare and Medicaid claims, falsified patient medical records and caused falsified CRNA, Anesthesiology Fellows and Anesthesiology Medical Students academic records and claims. Dr. Larson and McKesson knowingly allowed patients (including unborn babies) lives to be put in danger by first providing and supervising medical anesthesiology services, thus denoted by the billing CPT Codes, ICD9 Diagnosis Codes and by using the CPT Modifiers designated for the use of Anesthesiology Physicians. Also, Dr. Larson and McKesson knowingly (because I provided them with this same supporting information) that Dr. Larson was out-of-scope by disregarding Federal & State Rules and Regulations for a dentist.

Attached you will find emails and supporting documentation submitted to Mr. Jude Menes that should have been used after the defendants First & Second request to dismiss because of the my case had been dismissed. Please be advised that Mr. Menes neglected to use this information that was submitted in a timely manner for him to respond.

Attachment A is an email I submitted to Mr. Menes on 12/30/ 2013 after the defendants' first request to state a claim. Attachment B is an email I submitted on July 29, 2014 & Attachment C submitted to Mr. Menes on July 30, 2014 to support the Third Amended Complaint.

Also, Dr. Larson and McKesson management signed an agreement to comply with support the False Claims Act and was reminded when I submitted this same documentation to support the fact that we shouldn't submit claims or appeals on behalf of Dr. Larson's medical anesthesiology services after McKesson Compliance Director sent an email (Attachment D) and reiterated specific (Highlighted) information from the National Summit on Fraud and Abuse in 2011.

I quoted to my boss, Elizabeth Duhon and her boss Tom Butterick from McKesson Executive management team this CMS.Gov wording: *"When you submit a claim for services performed for a Medicare or Medicaid patient, you are filing a bill with the Federal Government and certifying that you have earned the payment requested and complied with the billing requirements.*

*If you knew or should have known that the submitted claim was false, then the attempt to collect unearned money constitutes a violation.   Examples of improper claims include:*

*Billing for services that you did not actually render; Billing for services that were not medically necessary; Billing for services that were performed by an improperly supervised or unqualified employee; Billing for services that were performed by an employee who has been excluded from participation in the Federal health care programs; Billing for services of such low quality that they are virtually worthless; and Billing separately for services already included in a global fee, like billing for an evaluation and management service the day after surgery.   And: executing, or attempting to execute, a scheme or artifice: To defraud any health care benefit program; or To obtain (by means of false or fraudulent pretenses, representations, or promises) any of the money or property owned by, or under the custody or control of, any health care benefit program; in connection with the delivery of or payment for health care benefits, items, or services."*

Again, I don't understand a lot of what is going on from a lawyer standpoint, but all I did was report this fraud and abuse as per the McKesson Employee standards.

I truly need your advice in getting this case settled.  Sincerely I appreciate your time in this matter and will await your instructions.

Sincerely,

Leslie Ann Williams
880 South Coit Road, #1507
Prosper, TX 75078
972-965-4443
Lwilli365247@hotmail.com

Attachment A

**SELAH' WILLIAMS**
to N. Jude M

Mon, Dec 30  2:42 PM

Re: I BRING SUPPORTING HARD COPY DOCUMENTATION OT
OUR NEXT MEETING

My background in healthcare started in 1975 in Detroit, Michigan where I worked in various Revenue Cycle positions.  I relocated to Atlanta, Georgia in 1986 and continued to work in health care as a Financial Systems Business Analyst.  In 1991 I relocated to Dallas, Texas and continued my career in health care at UT Southwestern Medical Center.  I worked in various management and consulting positions that include one year as a IT Billing Coordinator Systems Analyst that later resulted in me supervising the Provider Information Systems Unit.  For approximately three years I was selected to establish the billing coordination for the multi-specialty units within the Oral and Maxillofacial department (OMS).  The OMS department included General Dentistry, Oral Surgery, Maxillofacial Surgery, the sub-specialty of Prosthodontics and Orthodontics in which both included billing for both the technical and professional components of devices that were created and/or ordered for use on our patients.

Prior to moving to Houston, Texas in June of 2007 I took my career focus from the Physician Practice Management prospective to concentrate as a Project Manager in and Revenue Cycle Management and as a Financial Systems Analyst Hospital Managed Care Contracting.

 With all that said, I am very familiar with the rules and regulations that govern Medical and Dental Provider Enrollment (Government to include Medicare and Medicaid, etc.) and Managed Care and Hospital and Provider Credentialing, Privileges and Contracting.  So as a As stated on the Realtor's resume for the years worked from August 1992 to July, 2001 supervised and acted as Project Manager over the Department of Provider Information Systems at UT Southwestern Health Systems, Dallas, Texas. The Relator supervised a staff of six Database & Provider Enrollment Specialists; Acted as the IS Project Manager, coordinating & maintaining any projects that pertained to Medicare, Medicaid, TRICARE, CHAMPVA and all other State & local agencies Provider Enrollment, including the completion of any and all Provider Enrollment Applications for Medicare ( See the Institutional Providers CMS 855-A form at www.cms.gov/.../cms-forms/downloads/cms855a.pdf.) For any and all Texas Medicaid Provider Enrollment the completions of the applications were followed by using the Texas Medicaid Provider Procedures Manual: Vol. 1 (See the Texas Medicaid Provider Procedures Manual: Vol. 1 at www.tmhp.com/TMPPM/TMPPM_Living_Manual_Current/Vol1_00a_Preliminary_Information.pdf).
For any and all TRICARE Provider Enrollment the completion of the applications were followed by using the TRICARE Provider Certifications forms (See Sections on Individual, Group and Institutional at www.mytricare.com/internet/tric/tri/mtc_nprov.nsf/sectionmap/Frms_PrvdrFrms ). For any and all CHAMPUS/VA Provider Enrollment the completion of the applications were followed by using the web-site at the Department of Veterans Affairs Health Administration Center CHAMPVA (See http://www.va.gov/hac/forproviders/champva/champva.asp ).  The Realtor was also responsible for obtaining current Resumes, Letters of Specialty Assignments, Certifications of specific Expertise and Board Certifications, Education for all Degrees, Internships and Residency.  The responsibility also included to obtaining and reminding of upcoming licenses, Continuing Education and Certifications

while maintaining in the appropriate Provider Enrollment hard-copy files and on-line for each of the Clinical Departments Providers of Service in a centralized unit called Provider Information Systems.

2. Also the Relator and her staff managed all billing databases and Revenue Cycle Claims Processing of the HCFA 1500 Medical and the ADA Dental claims processes and statement billing, AR management & reporting for 1500+ providers of service by maintaining 36 different databases & in-house IS interfaces. The Relator not only specialized in utilizing the GE/IDX BAR, SCHED, PCS, AES, Fee Schedules, CPT& ICD.9 coding & billing, Dictionaries that produced accurate reporting systems & provided data for several in-house interfaces & programs for medical Clinical Departments but also for the Dental and Oral Surgery Divisions.

3. The Realtor outcomes resulted in quality and expedient Provider Enrollment, Billing of clean claims, Patient Statements & excellent Reimbursement. The Relator also participated on major project implementation teams that determined future business system enhancements, Provider Credentialing not only with Medicare, Medicaid and TRICARE, but with Managed Care and Commercial Third Party Payors. This also included billing and Provider Enrollment ventures in Clinical Specialties such as Cancer, Anesthesiology & Pain Management and Cancer. Some of the projects included were in the areas of Compass21-Medicaid provider Re-enrollment and the Medicaid Task Force on denial and re-bill processes. UPIN Conversion to NPI. Developed the department of Physician Practice Management, a team that worked as in-house consultants. Determined operations feasibility that impacted current service development of IS process design & revenue cycle management. Wrote RFI & RFP responses, Budget forecasting for the Moncrief Cancer Center & the Gambro Dialysis Center mergers, Simmons Breast/Cancer Center Budget. Created financial presentations for upper management to present to Department Chairmen. CRNA 1500 billing, Multi-group Allied Health Sciences School IS automation. Children's Medical Center (CMC) Outpatient Clinic revenue cycle & data process assessment process modeling. Provided analytics for Billing Ops/IDX Statement Mailing and Returned Mail cost-savings project & the Department of Surgery Trauma Air Ambulance start-up project, Oral Surgery stand-alone billing IS integration & the CMC Dental Clinic automation & clinical scheduling & billing system purchase & installation.

4. In the tenure of the Relator from October 1993 to October 1995 was hired at UT Southwestern Medical Center at Dallas in the department of Oral and Maxillofacial Surgery (OMS) and specialized as their BILLING COORDINATOR. In that capacity her responsibilities included but were not limited to Provider Enrollment, converting and automating the manual billing processes for the GE/IDX Medical, Dental and DME Billing and Accounts Receivables system to accommodate Medical, Dental and DME Revenue Cycle Management. Managed/monitored system and baseline data tests. Maintained the Provider's Master Schedules, Patient Scheduling, Billing and Reimbursement functions for the Department of Surgery's Oral Surgery Division and the four Clinical Specialties (Oral & Maxillofacial Surgery, Pediatric & Adult Orthodontics, Prosthodontics and General Dentistry). The Relator also was responsible for the Coordination and Project Management of all OMS Special Projects to set-up the Physician Practice filing systems, Aged Trial Balance Analysis and Reporting. The Relator also was responsible to conduct chart audits for the Dentist and the Oral Surgery Residents and Anesthesiology Residents that were on OMS rotation to assure that all Resident Academic Records and Patient Medical records were documented appropriately and so that the charges were accounted for and billed properly. Acted as a liaison between the Surgery Department, the OMS Division and Medical Service Plan Billing Operations. All efforts resulted in automated processes within GE/IDX for Medical, Dental

and Anesthesia billing system where the billing and collections increased as did the billing and collections increased for the UT Houston Department of Anesthesiology.  When the claims submitted for Dr. Larson were submitted and denied by Medicare, Medicaid and the Commercial and Managed Care Payors the Relator was assigned to analyze the denied claims and reasons and provide the appropriate documentation for the submission of appeals, one being the appropriate license and/or certificates and approval from CMS and the TSBDE.  Upon review of Dr. Larson's Provider Enrollment file on May 07 2008, the Relator and her staff member Becky Proctor physically noticed that there was a current <u>Dental License and a current Dental Nitrous Monitoring Certificate permitting Dr. Larson to administer Anesthesia Level 1, Level 2, Level 3 and Level 4 in the scope of Dentistry</u>, not Oral Surgery <u>nor</u> Medical Anesthesia.  There was no documentation on file from CMS nor the TSBDE, indicating Dr. Larson had completed the necessary Dental Specialty Training, <u>nor</u> that he was trained or licensed as an Oral & Maxillofacial Surgeon, <u>nor</u> were there any applications submitted requesting authorization to perform within the Specialty as a Dental Anesthesiologist.  At that point there was neither proof of training, nor a license showing that Dr. Larson was qualified and could be enrolled or credentialed as a Provider of Medical Anesthesia. Therefore proof indicated that he is out-of-scope for the use of his Dental License and his Dental Anesthesia certification and could not Medical Anesthesia services, teach or supervise as a Medical Anesthesiologist.  <u>However, what was on file was three letters of reprimand from three previous Chairmen at UT Houston's Department of Anesthesia advising him of restrictions of his Medical Anesthesiology services and ordering him to stay with-in the scope of Dentistry while providing any services while in the position as an Anesthesiology Operating Room (OR) Coordinator for which position he was hired for in 1977.</u>

5.  In checking the TSBDE web-site regarding Anesthesia Permitting Regulations (See http://www.tsbde.state.tx.us/index.php? option=com_content&task=view&id=179&Itemid=158 ).  The Relator found that Dr. Larson only had Anesthesia Permits as a General Dentist (<u>not</u> an Oral Surgeon, nor a Dentist specializing in Anesthesiology, <u>nor</u> as a Medical Doctor (M.D.)) although he was/is ***operating*** as an M.D.  As of 01/01/2002 1990 Dr. Larson was permitted to administer Enteral Conscious Sedation, and as of 09/21/1990 Dr. Larson <u>was grandfathered in and permitted</u> to administer Nitrous Oxide Conscious Sedation, Intranasal Conscious Sedation, Subcutaneous Conscious Sedation, Sub mucosal Conscious Sedation, Intramuscular Conscious Sedation, Intravenous Conscious Sedation and Deep Sedation/General Anesthesia in a Dental setting, not in a medical setting.  Dr. Larson to date has not been trained, licensed, certified or permitted to perform Anesthesia Medical services nor teach Anesthesia Residents studying <u>Medical</u> Anesthesiology, nor is he to supervise CRNA's, Fellows or other Medical Students or Mid-level providers out-side of the scope of <u>General Dentistry</u>.

NEEDLESS TO SAY THERE WAS NO ***AUDITABLE DOCUMENTATION*** IN DR. LARSON'S PROVIDER ENROLLMENT FILES THAT GAVE EVIDENCE TO OR CONFIRMED THAT HE WAS CERTIFIED OR LICENSE AS AN ORAL OR MAXILLOFACIAL SURGEON, A DENTIST (DMD OR DDS) SPECIALIZING IN DENTAL OR ANESTHESIOLOGY, OR AS A CRNA. THIS VIOLATES THE ***TSBDE RULE 104.5***.

DR. LARSON ALSO VIOLATED THE ***ANNOUNCEMENT OF SERVICES RULE 108.54*** BY ADVERTISING VIA UNIVERSITY WEB-SITE AND RELATED MANAGED CARE WEB-SITES THAT HE WAS A CEERTIFIED ANESTHESIOLOGIST AND A MD. THIS TYPE OF SPECIALTY ANNOCEMENT ALSO VIOLOTES THE ***SPECIALTY ANNOUNCEMENT RULE 108.56((A., B. & C. (1. 2(A. & B.))*** BY ADVERTISING AS A 'SPECIALIST' or BEING

IN A 'PRACTICE LIMITED TO' ANESTHESIOLOGY.  DR. LARSON DOES NOT HAVE THE REQIRED BOARD CERTIFICATIONS AS DISCRIBED IN *RULE 108.56 SPECIALTY ANNOUNCEMENTS (b)*, NOR DID HE COMPLET THE EDUCATIONAL REQUIREMENTS AS SET FORTH BY THE ADA (AMERICAN DENTIAL ASSOCIATION) IN *SPECIALTY ANNOUNCEMENT RULE 108.56(c)*.

DR. LARSON ALSO VIOLATED THE *SPECIALIST ANNOUNCEMENT OF CREDENTIALS IN NON-SPECIALTY AREAS AS STATED AND REQUIRED IN RULE 108.57*, AS HE *DID NOT* RECEIVE CERTIFICATION AND WAS NOT IN DIPLOMAT STATUS BECAUSE HE *DID NOT* HAVE EVIDENCE OF SUCCESSFUL COMPLETION OF A FORMAL, FULL-TIME ADVANCED EDUCATION PROGRAM IN WHICH HE ATTENDED FOR AT LEAST 12 MONTHS DURATION, *NOR DID HE HAVE AUDITABLE DOCUMENTATION* THAT  HE HAD TRAINING AND EXPERIENCE OR HAAD SUCCESSFULLY COMPLETED AN ORAL OR WRITTEN EXAMINATION BASED ON PSYCHOMETRIC PRINCIPLES AS STATED IN *SPECIALIST ANNOUNCEMENT OF CREDENTIALS IN NON-SPECIALTY AREAS RULE 108.57(1.)(A., B. & C.).*

DR. LARSON ALSO VIOLATED *SPECIALIST ANNOUNCEMENT OF CREDENTIALS IN NON-SPECIALTY AREAS RULE 108.57 (2.)* AS HE HAS *NO* RECOGNIZED ADA OR TSBDE SPECIALTY EARNED, APPROVED OR LISTED AS REQUIRED BY THIS RULE.  HE HAS ALSO VIOLATED RULE 108.57(2.)BY IMPLYING ON THE UNIVERSITY OF HOUSTON'S PHYSICIAN DEPARTMENT OF ANESTHESIOLOGY WEB-SITE THAT HE IS CERTIFIED IN A PRITICULAR SPECIALTY OF ANESTHESIOLOGY WHERE AS HE *HAS NOT* EARNED, BEEN CERTIFIED, LICENCED OR APPROVED IN SUCH SPECIALTY AS STATED IN *SPECIALIST ANNOUNCEMENT OF CREDENTIALS IN NON-SPECIALTY AREAS RULE 108.57(3.).*

DR. LARSON ALSO VIOLATED THE *DEGREES RULE 108.58((a.), (b.)& (c*.) AS HE IS NOT A SPECIALIST IN THE DESIGNATED FIELD OF *ANESTHESIOLOGY*; *NOR IS HE AUTHORIZEDTO PRACTICE MEDICINE IN TEXAS AS A "M.D." OR A "D.O." ALONG WITH HIS DENTAL DEGREE*; NOR HAS HE EARNED A TEXAS LICENSE, CERTIFICATE IN TWO OR MORE ADA-RECOGNIZED DENTAL SPECIALTIES.

DR. LARSON MAY HAVE BEEN *GRANDFATHERED* IN THE *PORTABILITY RULE 110.7* AS HE DID HOLD A LEVEL 4 DEEP SEDATION SEDATION/GENERAL ANESTHESIA PERMIT AND A LEVEL 3 MODERATE PARENTERAL SEDATION PERMIT AND HAD OBTAINED THE PERMIT ON THE BASIS OF RULE 110.7(3.)(A.) (i)–(iii).  HOWEVER IT IS QUITE QUESTIONABLE THAT DR. LARSON SATISFIED THE SPECIFIED REQUIREMENTS IN *PORTABILITY RULE 110.7(3),(A)(iv)* THAT HE SUCCESSFULLY  COMPLETED NO LESS THAT SIXTY (60) HOURS OF DIDACTIC INSTRUCTION AND MANAGED NO LES THAN (20) DENTAL PATIENTS BY INTRAVENOUS ROUTE OF ADMINISTRATIONAS STATED IN THAT HE CAN PROVIDE PROOF OF ADMINISTRATION OF NO LESS THAN THIRTY (30) CASES OF PERSONAL ADMINISTRATION OF LEVEL 3 SEDATION ON PATIENTS IN A PRIMARY OR SATELLITE PRACTICE LOCATION WITHIN THE SIX (6) MONTH PERIOD PRECEDING THE APPLICATION FOR PORTABILITY AS STATED IN THE *PORTABILITY RULE 110.7(c) (3)(B)* AND THE *PORTABILITY RULE 110.7(d)* AS DR. LARSON HAS MADE IT QUITE EVIDENT THAT HE IS OPERATING AS A M.D. IN THE PHYSCIAN PRACTICE PLAN AND AS A PROFESSOR IN THE DEPARTMENT OF ANESTHESIOLOGY SUPERVISING MEDICAL ANESTHEIOLOGY RESIDENTS, FELLOWS & CRNA STUDENTS BY USING THE MEDICAL MODIFIERS ON CLAIMS SUBMITTED TO MEDICARE THE STATE OF TEXAS MEDICAID PROGRAMS AND TO MANY MANAGED CARE PAYORS THAT INDICATE SUCH SUPERVISORY SERVICES WERE RENDERED.

IT IS QUITE QUESTIONABLE THAT DR. LARSON HAS ALSO VIOLATED THE ANESTHEIA PERMIT RENEWAL RULE 110.9(c)(1),(2)&(3).

DR. LARSON HAS NO AUDITABLE DOCUMENTATION OR ON-LINE PROOF THAT HE HAS SATISFIED THE LICENSURE BY EXAMINATION RULE 101.2(c)(2)&(3) AND/OR THE REMEDIATION RULE 101.2(e) NOR THE LICENSRE BY CREDENTIALS AS STATED IN RULE 101.3 *AS BEING ENDORSED BY THE TSDBE IN THE SPECIFIED SPECIALTY OF **MEDICAL OR DENTAL** ANESTESIOLOGY*.

DR. LARSON ALSO APPERS TO BE IN VIOLATION OF THE TITLE 22- EXAMINING BOARDS,PART 5- STATE BOARD OF DENTAL EXAMINERS,CHAPTER 117- FACULTY ANAD STUDENT IN ACCREDITED DENTAL SCHOOLS, RULE 117.2- DENTAL FACULTY LICENSURE, AS DR. LARSON IS USING HIS ***FACULTY*** PRIVILEGES AS A MEDICAL DOCTOR SPECIALIZING IN ANESTHESIOLOGY.

Sent from Windows Mail

**From:** N. Jude M
**Sent:** Thursday, December 19, 2013 10:20 PM
**To:** Ms. Leslie WILLIAMS

Thanks. The court granted our motion for extension of time. We have till January 14 to file our response.

Jude Menes

THIS EMAIL MESSAGE IS ATTORNEY-COMMUNICATION AND MAY BE PROTECTED BY ATTORNEY-CLIENT PRIVILEGE AND/OR OTHER PROTECTION AFFORDED BY LAW. IF YOU ARE NOT THE INTENDED RECEIPIENT OF THIS MESSAGE, DELETE IT IMMEDIATELY AND NOTIFY SENDER.

---

From: lwilli365247@hotmail.com
To: jude@meneslawfirm.com
Subject: Fw:
Date: Fri, 20 Dec 2013 03:21:17 +0000

http://www.tsbde.state.tx.us/index.php?option=com_content&task=section&id=9&Itemid=101Hi **Jude,** FYI, I don't think the TSBDE is aware of Larson's fraudulent actions, for he has violated several regulations. I don't know why I didn't file a complaint with them...

Leslie Ann
*SEALH'* Consulting Services
972-965-4443

Sent from Windows Mail

**From:** SELAH' WILLIAMS
**Sent:** Wednesday, December 18, 2013 11:50 AM
**To:** jude@meneslawfirm.com


http://www.dallasnews.com/investigations/patient-safety/headlines/20130531-parklands-1.4-million-settlement-of-whistleblower-lawsuit-is-final.ece
1.   **This is a similar case that settled here in Dallas, led and won by the Sean McKenna, Assistant US Attorney (the same guy that interviewed me).**

**This may give a lead to some attorney's...**

—————————————————————


http://www.nytimes.com/2004/01/08/business/us-awards-tenet-whistle-blowers-8.1-million.html?ref=kurteichenwald

2.   **This was another case that may be of assistance...**

—————————————————————


http://www.nytimes.com/2003/08/07/business/tenet-healthcare-paying-54-million-in-fraud-settlement.html?ref=kurteichenwald

3.  **This one is also similar...**


—————————————————————


http://www.nytimes.com/2002/12/18/business/hca-is-said-to-reach-deal-on-settlement-of-fraud-case.html?ref=kurteichenwald

4.  **This one is good...  We just have to be persistent...**

————————————————————————————


Leslie Ann
*SELAH'* Consulting Services



**Sent from Windows Mail**

*Attachment B*

## SELAH CONSULTING SERVICES

Tue, Jul 29  11:22 AM

to jude@meneslawfirm.com
cc BRENDA HATFIELD; tope@meneslawfirm.com

## No subject

1 file attached ∧



ANES - DR LARSON...
.xls 174 KB

(1) Provide and cite to a specific Medicare/Medicaid regulation, which says that only medical doctors can perform non-dental anesthesia or which says that dentists with only DMD cannot perform non-dental anesthesia.  **This will be in the TSBDE regulations**

(2) Provide and cite to a specific Medicare/Medicaid regulation, which says that non-dental anesthesia performed by non-medical doctors will not be paid for.

**In checking the TSBDE web-site:**

**Reference:**
**•CMS Pub. 100-04, Chapter 12 (PDF, 978 KB)**
◦**Definitions of personally performed, medically directed and medically supervised: Section 50**
◦**Definition of concurrent procedures: Section 50J**
◦**Anesthesia modifiers: Section 50K**
◦**Base units for anesthesia services: following Section 50K: Exhibit 1**
  **last updated on 06/02/2011**
and,

**Reference:**
**•CMS Internet Only Manuals, Pub. 100-04, Chapter 12 (PDF, 957 KB)**

It was found that Dr. Larson only had Anesthesia Permits as a General Dentist (not an Oral Surgeon, nor a Dentist specializing in Anesthesiology, nor as a Medical Doctor (M.D.)) although he was/is ***operating*** as an M.D.  As of 01/01/2002 1990 Dr. Larson was permitted to administer Enteral Conscious Sedation, and as of 09/21/1990 Dr. Larson was permitted to administer Nitrous Oxide Conscious Sedation, Intranasal Conscious Sedation, Subcutaneous Conscious Sedation, Submucosal Conscious Sedation, Intramuscular Conscious Sedation, Intravenous Conscious Sedation and Deep Sedation/General Anesthesia in a Dental setting, not in a medical setting.  Dr. Larson to date has not been trained, licensed, certified or permitted to perform Anesthesia medical services nor teach residents studying medical Anesthesiology, nor is supervise Mid-level provider out-side of the scope of General Dentistry.

The Taxonomy is determined by the type of form submitted and approved by Medicare & Medicaid

Medicare, Medicaid, TRICARE, CHAMPVA and all other State & local agencies Provider Enrollment, including the completion of any and all Provider Enrollment Applications for Medicare ( See the Institutional Providers CMS 855- A form at www.cms.gov/.../cms-forms/downloads/cms855a.pdf.) For any and all Texas Medicaid Provider Enrollment the completion of the applications were followed by using the Texas Medicaid Provider Procedures Manual: Vol. 1 (See the Texas Medicaid Provider Procedures Manual: Vol. 1 at www.tmhp.com/TMPPM/TMPPM_Living_Manual_Current/Vol1_00a_Preliminary_Information.pdf).  For any and all TRICARE Provider Enrollment the completion of the applications were followed by using the TRICARE Provider Certifications forms (See Sections on Individual, Group and Institutional at www.mytricare.com/internet/tric/tri/mtc_nprov.nsf/sectionmap/Frms_PrvdrFrms ).  For any and all CHAMPUS/VA Provider Enrollment the completion of the applications were followed by using the web-site at the Department of Veterans Affairs Health Administration Center CHAMPVA (See http://www.va.gov/hac/forproviders/champva/champva.asp ).

(3) We need basis to allege that Dr. Larson and McKesson submitted claims to the government and certified to (told) the government that Dr. Larson was an MD and was therefore qualified to perform and seek payment the services in the claims.  By using AMA (American Medical Association) Modifiers Dr. Larson alleged that he was billing the government as a M.D.

**ANESTHESIOLOGY RESEARCH**

Let's start with the definition of an **anesthesiologist** (US English) or **anaesthetist** (British English) is a physician trained in anesthesia and perioperative medicine. In the United Kingdom, the term *anaesthetist* refers exclusively fully registered medical practitioners (university graduates in medicine). In a very few UK hospitals some duties are performed by non-physicians, but only under close physician anaesthetist supervision. Training of these physicians' assistants (anaesthesia) in the UK has effectively ceased. In the UK training in anaesthesia for a fully registered physician takes seven years full-time.

In the USA, anesthesiologists are physicians who complete an accredited residency program in anesthesiology, usually four years following medical school either with MD or DO degree.

**Modifiers**

Anesthesia Physicians (Anesthesiologist) and Mid-Level Anesthesia Providers (C.R.N.A'S or Anesthesia Assistants, etc.) report the appropriate anesthesia modifier(s) to denote whether the service was personally performed, medically directed, or medically supervised.  Specific anesthesia modifiers include:

**HCPCS Modifier AA**

Description:

Anesthesia services performed personally by anesthesiologist, or when an anesthetist assists a physician in the care of a single patient

Guidelines/Instructions:

•This modifier may only be submitted with anesthesia procedure codes (e.g., CPT codes 00100 through 01999)

•Payment for services that meet the definition of 'personally performed' is based on the base units (as defined by CMS) and time in increments of 15-minute units

In the following situations, the anesthesia service is considered 'personally performed':

•The physician personally performed the entire anesthesia service alone (this equates to **one** false anesthesia bill & the false documentation of **one** patient medical record)

•The physician is involved with one anesthesia case with a **resident**, and the physician is a **teaching physician** (this equates to **one** false anesthesia bill, the false documentation of **one** patient medical record and the false documentation of **one** student/Resident academic record)

◦For the definition of a teaching physician, refer to the CMS Web site (PDF, 978 KB) Pub. 100-04, Chapter 12, Section 100

•The physician is continuously involved in a single case involving a **student** nurse anesthetist (this equates to **one** false anesthesia bill, the false documentation of **one** patient medical record and the false documentation of **one** student CRNA academic record)

•The physician and one Certified Registered Nurse Anesthetist (CRNA) or anesthesia assistant (AA) are involved in one anesthesia case and the services of each are medically necessary (this equates to **two** false anesthesia bills and **one** false documentation of the patient medical record.  In the case of the AA there will be **one** false claim and **two** false documentations, and the AA will be inappropriately supervised)

1. Documentation must be submitted by **both** the physician and the CRNA or AA to support medical necessity and to allow reimbursement at the 'personally performed' rate, and
2. In these situations, the physician must submit the anesthesia service with HCPCS modifier **AA** (personally performed). The physician must submit the anesthesia service with HCPCS modifier **QZ** (not medically directed). The CRNA must submit the anesthesia service with HCPCS modifier **QZ** (not medically directed). The AA may **only** submit anesthesia services with HCPCS modifier **QX** (medically directed).

Reference:

•CMS Pub. 100-04, Chapter 12 (PDF, 978 KB)

○Definitions of personally performed, medically directed and medically supervised: Section 50

○Definition of concurrent procedures: Section 50J

○Anesthesia modifiers: Section 50K

○Base units for anesthesia services: following Section 50K: Exhibit 1

 last updated on 06/02/2011


## HSPCS MODIFIER AD & QX & QY – Medical Supervision and or Direction

**AD -** Medical Supervision by a physician; more than 4 concurrent anesthesia procedures;
Report modifier AD when the anesthesiologist supervises more than four concurrent anesthesia procedures. Claims submitted with modifier AD are reimbursed as described in the preceding section.

**QX -** CRNA service; with medical direction by a physician;

**QY -** Medical direction of one certified registered nurse anesthetist by an anesthesiologist;

### CRNA and an Anesthesiologist in a Single Anesthesia Procedure
### (Rev. 1, 10-01-03)  B3-4172.6
Where a single anesthesia procedure involves both a physician medical direction service and the service of the medically directed CRNA, and the service is furnished on or after January 1, 1998, the payment amount for the service of each is 50 percent of the allowance otherwise recognized had the service been furnished by the anesthesiologist alone. The modifier to be used for current procedure identification is **QX**. (this equates to **two** fraudulent anesthesia bills and **one** fraudulent documentation of the patient medical record and fraudulent supervision and/or direction of the CRNA)

Beginning on or after January 1, 1998, where the CRNA and the anesthesiologist are involved in a single anesthesia case, and the physician is performing medical direction, the service is billed in accordance with the following procedures:
• For the single medically directed service, the physician will use the modifier "**QY**" (**MEDICAL <u>DIRECTION</u> ONE CERTIFIED REGISTERED NURSE ANESTHETIST (CRNA) BY AN ANESTHESIOLOGIST**). This modifier is effective for claims for dates of service on or after January 1, 1998, and

• For the anesthesia service furnished by the medically directed CRNA, the CRNA will use the current modifier "**QX**."


### Payment at the Medically Directed Rate
The Part B Contractor determines payment for the physician's medical direction service furnished on or after January 1, 1998, on the basis of 50 percent of the allowance for the service performed by the physician alone. Medical direction occurs if the physician medically directs qualified individuals in **two**, **three**, or **four** concurrent cases and the physician performs the following activities:

• Performs a pre-anesthetic examination and evaluation;
• Prescribes the anesthesia plan;

• Personally participates in the most demanding procedures in the anesthesia plan, including induction and emergence;
• Ensures that any procedures in the anesthesia plan that he or she does not perform are performed by a qualified anesthetist;
• Monitors the course of anesthesia administration at frequent intervals;
• Remains physically present and available for immediate diagnosis and treatment of emergencies; and
• Provides indicated-post-anesthesia care.

Prior to January 1, 1999, the physician **was** required to participate in the most demanding procedures of the anesthesia plan, including induction and emergence.
For medical direction services furnished on or after January 1, 1999, the physician **must** participate only in the most demanding procedures of the anesthesia plan, including, if applicable, induction and emergence. Also for medical direction services furnished on or after January 1, 1999, the physician must document in the medical record that he or she performed the pre-anesthetic examination and evaluation. Physicians must also document that they provided indicated post-anesthesia care, were present during some portion of the anesthesia monitoring, and were present during the most demanding procedures, including induction and emergence, where indicated.

For services furnished on or after January 1, 1994, the physician can medically direct two, three, or four concurrent procedures involving qualified individuals, all of whom could be CRNAs, AAs, interns, residents or combinations of these individuals. **The medical direction rules apply to cases involving student nurse anesthetists if the physician directs two concurrent cases, each of which involves a student nurse anesthetist, or the physician directs one case involving a student nurse anesthetist and another involving a CRNA, AA, intern or resident.**
For services furnished on or after January 1, 2010, the medical direction rules do not apply to a single resident case that is concurrent to another anesthesia case paid under the medical direction rules or to two concurrent anesthesia cases involving residents.
If anesthesiologists are in a group practice, one physician member may provide the pre-anesthesia examination and evaluation while another fulfills the other criteria. Similarly, one physician member of the group may provide post-anesthesia care while another fulfills the other criteria. Similarly, one physician member of the group may provide post-anesthesia care while another member of the group furnishes the other component parts of the anesthesia service.
 However, the medical record must indicate that the services were furnished by physicians and identify the physicians who furnished them.
A physician who is concurrently directing the administration of anesthesia to not more than four surgical patients cannot ordinarily be involved in furnishing additional services to other patients. However, addressing an emergency of short duration in the immediate area, administering an epidural or caudal anesthetic to ease labor pain, or periodic, rather than continuous, monitoring of an obstetrical patient **does not** substantially diminish the scope of control exercised by the physician in directing the administration of anesthesia to surgical patients. It does not constitute a separate service for the purpose of determining whether the medical direction criteria are met. Further, while directing concurrent anesthesia procedures, a physician may receive patients entering the operating suite for the next surgery, check or discharge patients in the recovery room, or handle scheduling matters without affecting fee schedule payment.
However, if the physician leaves the immediate area of the operating suite for other than short durations or devotes extensive time to an emergency case or is otherwise not available to respond to the immediate needs of the surgical patients, the physician's services to the surgical patients are supervisory in nature. Carriers may not make payment under the fee schedule.

**QK Medical Direction of Two, Three, or Four Concurrent Anesthesia Procedures Involving Qualified Individuals:**

Report modifier QK when the anesthesiologist supervises two, three or four concurrent anesthesia procedures. Claims submitted with modifier QK are reimbursed at 50 percent.

**HCPCS Modifier QK**

Description:

Medical direction of **two**, **three** or **four** concurrent anesthesia procedures involving **qualified individuals** (this could result in **multiple** false claims, **multiple** falsely documented patient medical records and **multiple** falsely documented student/resident academic records.

Guidelines/Instructions:

•This modifier may only be submitted with anesthesia procedure codes (i.e., CPT codes 00100 through 01999). Payment for services that meet the definition of 'medically directed' is based on 50 percent of the 'personally performed' rate.

•If you are submitting multiple modifiers, submit this modifier first

Physician services may be reimbursed at the medically directed rate if the physician medically directs qualified individuals in two, three or four concurrent cases and performs the following activities:

•Performs a pre-anesthetic exam and evaluation (must be documented in the patient's medical records)

•Prescribes the anesthesia plan

•Personally participates in the most demanding procedures in the anesthesia plan, including induction and emergence (physician presence must be documented in the patient's medical record)

•Ensures that any procedures in the anesthesia plan that he or she does not perform are performed by a qualified anesthetist

•Monitors the course of anesthesia administration at frequent intervals (physician presence during some portion of anesthesia monitoring must be documented in the patient's medical records)

•Remains physically present and available for immediate diagnosis and treatment of emergencies

•Provides indicated post-anesthesia care (must be documented in the patient's medical records)

Additional Guidelines for Medically Directed Services

•A physician can direct two, three or four concurrent procedures involving qualified individuals. The 'qualified individuals' may be CRNAs, AAs, interns, residents or a combination of these individuals.

•Medical direction rules apply when a physician directs two concurrent procedures and each of which involves a student nurse anesthetist

•Medical direction rules also apply when a physician directs two concurrent procedures and one of which involves a student nurse anesthetist and the other of which involves a CRNA, AA, resident or intern

•Special notes for anesthesiologists in group practice:

○One physician member may perform the pre-anesthetic exam and evaluation while another physician member performs the other required activities

○One physician member may perform the indicated post-anesthesia care while another physician member of the group performs the other portions of the anesthesia service

○The medical record must indicate that the services were provided by a physician and must identify the specific physician that performed them

Reference:

•CMS Internet Only Manuals, Pub. 100-04, Chapter 12 (PDF, 957 KB)


○Definitions of personally performed, medically directed and medically supervised: Section 50

○Definition of concurrent procedures: Section 50J

○Anesthesia modifiers: Section 50K

○Base units for anesthesia services: following Section 50K: Exhibit 1


G8 - Monitored anesthesia care (MAC) for deep complex/complicated, or markedly invasive surgical procedures;

G9 - Monitored anesthesia care for patient who has a history of severe cardio-pulmonary condition;

## QS - Monitored Anesthesia Care

The Part B Contractor pays for reasonable and medically necessary monitored anesthesia care services on the same basis as other anesthesia services. Anesthesiologists use modifier QS to report monitored anesthesia care cases. Monitored anesthesia care involves the intra-operative monitoring by a physician or qualified individual under the medical direction of a physician or of the patient's vital physiological signs in anticipation of the need for administration of general anesthesia or of the development of adverse physiological patient reaction to the surgical procedure. It also includes:
  • The performance of a pre-anesthetic examination and evaluation,
  • Prescription of the anesthesia care required,
  • Administration of any necessary oral or parenteral medications (e.g., atropine, demerol, valium) and Provision of indicated postoperative anesthesia care.
    Payment is made under the fee schedule using the payment rules in subsection B if the physician personally performs the monitored anesthesia care case or under the rules in subsection C if the physician medically directs four or fewer concurrent cases and monitored anesthesia care represents one or more of these concurrent cases.

  QZ - CRNA service: without medical direction by a physician; and

  GC - these services have been performed by a resident under the direction of a teaching physician.
  The GC modifier is reported by the teaching physician to indicate he/she rendered the service in compliance with the teaching physician requirements in §100.1.2. One of the payment modifiers must be used in conjunction with the GC modifier.

  QS Modifier is for informational purposes. Providers must report actual anesthesia time on the claim.
  The Part B Contractor must determine payment for anesthesia in accordance with these instructions. They must be able to determine the uniform base unit that is assigned to the anesthesia code and apply the appropriate reduction where the anesthesia procedure is medically directed. They must also be able to

determine the number of anesthesia time units from actual anesthesia time reported on the claim. The Part B
Contractor must multiply allowable units by the anesthesia-specific conversion factor used to determine fee
schedule payment for the payment area.

(4) The court also stated that we need to clarify the what, when, and
how of the alleged false claims. So, details regarding what false
claims were submitted, when they were submitted, and how they
were false.

See attached spreadsheet... The claims are considered false because:

1. Dr. Larson has a Dental license with the Texas Dental Board
2. Dr. Larson has a Dental Anesthesia certificate to administer
   Anesthesia up to a Level 4
3. Dr. Larson was assigned a General Dentist Taxonomy based on
   his submission of CMS Form 855(a) by CMS to bill for general
   dental services using the ADA billing codes.
4. See the attached spread sheets indicating Dr. Larson rendered
   medical services to patients at Memorial Hermann Inpatient and
   Outpatient Day Surgery
5. Dr. Larson signed as a M.D. on the patient medical records, thus
   indicating to McKesson coders that he is a certified
   Anesthesiologist, M.D. (**Please note** UT Houston Physician
   Practice Plan manages their own Provider Enrollment &
   Credentialing at the Clinical Department/Division level)
6. McKesson coded, added the appropriate Medical billing
   Modifiers & billed Dr. Larson's medical services based on the
   Medical Record documentation presented by UT Houston's
   Department of Anesthesiology (Please note Dr. Larson's services
   were billed on a HCFA Medical 1500 claim form via paper or
   electronic, not on an American Dental Association (ADA) claim
   form. Thus certifying that Dr. Larson performed medical
   anesthesia services and submitted false medical claims.

SELAH' Consulting Services
LESLIE ANN WILLIAMS

**Executive Director**
**Six Sigma ~ Green Belt ~ Process Management & Design**

**972-965-4443 ~ Cell**

selahconsultingservices@Hotmail.com

*Attachment D*

# THIS PROVES OUR PRESIDENT IS ON TARGET...

**From: SELAH' CONSULTING SERVICES** (selahconsultingservices@hotmail.com)
Sent: Sun 10/07/12 9:30 AM
To:    Brenda Hatfield (brenda.hatfield@hotmail.com); arpevangelist@hotmail.com; THERESA
       STANFORD (t_henry_stanford@msn.com); SHELLEY WILLIAMS
       (tobeastar5@gmail.com); DANIELLE WILLIAMS (missdjay@gmail.com); Stephen
       Patrick (lotsofstuffdallas@yahoo.com); RANDALL BRYANT
       (buildfoundation@yahoo.com)

An email was distributed from the corporate office and distributed to management level employees with these instructions, then the same corporate executives retaliate against those who follow their rules:

**Subject:** HHS publication of enhanced Fraud Abuse for 2011 FY

The department of Health and Human Services (HHS) published an article that drives home the intention of CMS, HHS and the OIG in relation to investing in Fraud Waste and Abuse investigations in fiscal year 2011 (begins in April 2010). This publication should be shared with all clients as informational content as well as to prepare them for the potential increase in external reviews by the CMS carriers/MACs, CERT, RAC and other audits. The government is clearly showing that they have very little tolerance for Medicare/Medicaid Fraud/Abuse and are stepping up efforts to identify and remove such activity.

I have highlighted in yellow background specific information about this National Summit and the topics that will be unveiling. Clients "may" see a sharp increase in external audit review requests; crack down on inappropriate coding/billing, regulatory requirements (i.e. provider enrollment updates, referring/ordering physician documentation) as well as many other topics in both Part B and DMERC. Our clients should be aware that this stance by the government to include collaboration with the private insurance industry as well as the state Medicaid industry is a serious topic that is being brought to the forefront of healthcare. Per Se (RMS) personnel should be ready to assist/discuss potential requests for medical records from outside agencies and the importance of reviewing those medical records and getting them to the auditors quickly and well within the deadline. Clients should make their own employees aware of this issue and be on the lookout for these types of notification letters and ensure a process is in place at their office(s) in order not delay responses to the auditors.

While this is a serious topic with the government it is also an opportunity for Per Se (RMS) to demonstrate to our clients of the resources and knowledge that our compliance, legal, operations as well as all departments of our organization possess. Let's all join forces here to ensure we are on top of the issues that come to the forefront that these outside auditors are looking for and attack those issues now, resolve them where they are identified and educate, educate, educate our staff and clients on acceptable processes to maintain compliance.

**Lisa A. Schroeder, CHC, CPC, CCS-P**

**Compliance Program Director**

**McKesson Provider Technologies**

Academic & Multi-Specialty Groups

Direct Phone: 317-859-1062

Fax: 770-666-9195

Mobile: 317-755-9389

lisa.schroeder@mckesson.com

www.mckesson.com

Integrity Customer First  Accountability Respect Excellence

 Please consider the environment before printing this email.

*This was the attachment that accompanied the above email:*

**CMS and HHS Press Releases**
**HHS Press Releases 2010**
**2010.01.28: Health & Human Services Secretary Kathleen Sebelius, Attorney General Eric Holder Convene National Summit on Health Care Fraud, Unveil Historic Commitment to Fighting Fraud in President's FY 2011 Budget**

FOR IMMEDIATE RELEASE
Thursday, January 28, 2010

Contact: HHS Press Office: (202) 690-6343
DOJ Press Office: (202) 514-2007

**2010.01.28: Health & Human Services Secretary Kathleen Sebelius, Attorney General Eric Holder Convene National Summit on Health Care Fraud, Unveil Historic Commitment to Fighting Fraud in President's FY 2011 Budget**

*Summit Brings Private and Public Sectors, Law Enforcement Together to Fight Fraud*

U.S. Department of Health and Human Services Secretary Kathleen Sebelius and Attorney General Eric Holder today joined private sector leaders, law enforcement personnel and health care experts for a landmark National Summit on Health Care Fraud. The summit is the first national gathering on health care fraud between law enforcement and the private and public sectors and is part of the Obama Administration's coordinated effort to fight health care fraud.

"The Obama Administration has zero tolerance for health care fraud and abuse," said Secretary Sebelius. "Building on the work we have accomplished through HEAT (the Health Care Fraud Prevention & Enforcement Action Team), I am pleased to announce here at the National Summit on Health Care Fraud that the President's FY 2011 Budget being unveiled next week will include historic support for anti-fraud efforts that will save billions over 10 years. He will call for increased investments in programs that have a proven record of preventing fraud, reducing payment errors and returning funds to the Trust Funds."

"Health care fraud affects all Americans and demands a coordinated, national response," said Attorney General Holder. "HEAT has proven that better collaboration is the key to combating these crimes, recovering stolen resources, and protecting essential Medicare and Medicaid dollars. We welcome the private sector's participation in this work - together, I'm confident we can make great strides in identifying, preventing, and punishing health care fraud."

The National Summit features discussions of innovative ways to eliminate fraud and abuse in the U.S. health care system. The morning program includes remarks from Secretary Sebelius, Attorney General Holder, Congressman Ron Klein and James Roosevelt Jr. CEO of Tufts Health Care, who will address the important role of the private sector in fighting fraud. Later, officials from the Departments of Health and Human Services and Justice will participate in a panel discussion about methods being used to prevent and crack down on health care fraud.

In the afternoon, workgroups will focus on the:

Use of technology to prevent and detect health care fraud and improper payments.

Role of states in preventing health care fraud.

Development of effective prevention policies and methods for insurers, providers and beneficiaries.

Effective law enforcement strategies.

Measuring health care fraud, assessing recoveries and determining resource needs.

Summaries of the workgroup discussions will be compiled in a publicly available report that will help strengthen the federal government and private sector's work to deter health care fraud.
"Health care fraud isn't just a government problem. Criminals don't discriminate and they are stealing from Medicare, Medicaid and private companies at an unacceptable

rate," said Sebelius. "We have a shared interest in stopping these crimes and today's summit brought us together to discuss how we can all work together to fight fraud."

The National Summit is the latest initiative of HEAT, which was announced by Attorney General Holder and Secretary Sebelius in May 2009. The partnership between the two departments has focused efforts to reduce and prevent Medicare and Medicaid fraud through enhanced cooperation. Expansion of the Medicare Fraud Strike Force operations is a key component of the HEAT taskforce. Strike Force Teams initially began in Miami in 2007 and expanded to Los Angeles in 2008. Since the formation of HEAT, the Strike Force has expanded to Detroit; Houston; Brooklyn, N.Y.; Baton Rouge, La. and Tampa, Fla..

To date, Strike Force Teams have obtained indictments of more than 500 individuals and organizations that collectively have falsely billed the Medicare program for more than one billion dollars.

For more information on the National Summit, visit www.healthcarefraudsummit.com.


*And this is the information from the Healthcare Fraud Summit:*


**Bethesda, MD - January 28, 2010**

Good morning. I want to join Deputy Secretary Corr and Incoming Acting Deputy Attorney General Grindler in welcoming you here today.

We're here because this administration has zero tolerance for criminals who steal from taxpayers, endanger patients, and jeopardize Medicare's future. At a time when many families are scraping together every last dollar to pay their medical bills, fraud, waste, and abuse in our health care system are unacceptable.

Today, the President has asked us to put these criminals on notice. Attorney General Holder and I have convened this unprecedented Summit, featuring leaders from the public and private health care sectors, because we believe that the problem of health care fraud is bigger than either government, law enforcement or the private industry can handle alone. We will need all of us working together to solve it. In the fight to prevent, find, catch, and prosecute these crooks, we want every good idea we can get.

Everyone here has something to offer because health care fraud is a national problem. It affects federal programs like Medicare, state programs like Medicaid, and private insurance companies. We're all vulnerable because we're all part of a health care system that has been undergoing rapid growth. Between 1970 and today, America's annual health care spending has gone from $75 million to over $2.5 billion. That has produced significant benefits for patients. But it's also created a much bigger target for criminals. And a much bigger challenge for investigators. The difference between catching fraud then and now is the difference between trying to find a penny in a bathtub and trying to find a penny in a swimming pool.

It's not that we didn't take steps to improve our ability to detect and prosecute fraud during those 40 years. We did. But the problem grew faster than our solutions. We fell behind, and Americans paid the price. Today, Medicare, Medicaid and private insurance companies all pay out billions of dollars in fraudulent claims, and charge Americans higher premiums to pay for it. When a criminal sends a false claim to an insurer, he's stealing from all of us. And there are other victims too, like the patients who get fake or unnecessary treatments from crooked health care providers who bill insurers for the full amount.

From the perspective of this administration, what's even worse is that health care fraud violates two sacred trusts: our promise to taxpayers that we will spend their money wisely and our promise to seniors and all Americans that we will do everything we can to protect Medicare for this generation and generations to come. To keep that trust, we knew that we had to act now.

So last May, President Obama instructed Attorney General Holder and me to create a new Health Care Fraud Prevention and Action Task Force, which we call HEAT for short. HEAT is an unprecedented partnership that brings together high-level leaders from both departments so that we can share information, spot trends, coordinate strategy, and develop new fraud prevention tools.

Let me give you one example of how HEAT is already changing the way we fight fraud. Ten years ago, when you found out about a fraud scheme, it was usually because you got a tip from an informant. That's still a useful law enforcement tool. But with more than four and a half million claims being paid out every working day from Medicare alone, we can't afford to sit around and wait for tips to come in. We needed to be more proactive.

So as part of our new partnership with the Justice department, we're developing tools that will allow us to identify criminal activity analyzing suspicious patterns in claims data. Medicare claims data used to be scattered among several databases belonging to different contractors. If we wanted to find out how many claims had been made for a certain kind of wheelchair, we had to go look in several different places. But now, we're combining all Medicare paid claims data into a single, searchable database. (And we pay over $1B in claims every day!) Which means for the first time ever, we'll have a complete picture of what kinds of claims are being filed across the country, and where they're being filed from.

We're also getting smarter about the analyzing claims in real time. Using new tools and methods, we can spot trends, whether it's in geographic areas or in the type of billings. And once you start looking at this data, what you find is shocking. There are counties where claims for one kind of treatment are ten times higher than the county next door with no reasonable explanation. For example, we were recently able to see that Miami Dade County, which is home to two percent of Medicare home health patients, has ninety percent of home health patients receiving more than $100,000 in care each year. When you see numbers like that, you don't need a PhD in statistics to know something is going on.

In a few minutes, you're going to hear from Attorney General Holder about how we're using this information to crack down on criminals. One of our most effective tools has been our unique Strike Force teams, which are made up of federal prosecutors, FBI agents, and agents from my department's Office of the Inspector General who know more about fighting health care fraud than just about anybody.

But prosecuting fraud is only half of our strategy. The most effective way to protect taxpayers' money is to stop fraud from happening in the first place. That's why we also have an aggressive new

focus on prevention. One good example is what we're doing to stop fraudulent claims for durable medical equipment. That's the category that includes everything from wheelchairs to diabetes test strips, and it used to be very appealing to criminals because it was relatively easy to set up a fake storefront. All you had to do was rent a room, put some equipment on the shelves, get a phone line and you were set.

But in the last year, we've made it a lot harder for crooks to run this scam. First, we're conducting more random site visits. Second, we created a new, mandatory accreditation process for durable medical equipment providers. Now, before you can become a Medicare provider, you have to go through a rigorous third-party review process where they make sure you have the correct licenses, the right insurance, and enough business capital. The days when you could just hang a shingle and start billing Medicare are over. We're also requiring these suppliers to post a $50,000 bond, so that if we do catch them committing fraud, we're guaranteed to recover some if not all of their illegal gains.

These are just some of the steps we're taking to prevent, catch, prosecute, and discourage fraudsters. We're realistic about what we can accomplish. There's some fraud and waste in every business. But our goal is to make the chances of getting caught so great and the consequences so high that the vast majority of crooks get scared away. To do that, we've also enlisted the group that's more passionate about defending Medicare than any other: seniors themselves.

Since 1997, my department has funded an organization called the Senior Medicare Patrol. The Patrol is made up of seniors who are tired of seeing Medicare threatened by crooks and have decided to do something about it. So they volunteer to go out to senior centers and adult day care centers and educate their neighbors about how to read Medicare statements, identify fraudulent claims, and report them to the correct authorities. In the last twelve years, they've reached over twenty million Americans. The way we look at it, that's like having over twenty million undercover cops on the street. The more seniors know how to recognize fraud, the more criminals are going to be nervous about trying to cheat them.

When you add these efforts up, we believe we've done more to fight health care fraud in 2009 than in any year in our country's history. But to end fraud, we need to make an even bigger commitment. That's why the President is making an historic investment in anti-fraud efforts in his budget next week that, combined with other changes, will result in billions in savings.

We know that the funds we commit to fighting fraud are some of the best investments our country makes, returning several dollars back in savings for every dollar we invest in fighting fraud, taking money out of the pockets of criminals and returning it to the Trust Funds to stabilize Medicare and keep our trust with taxpayers.

Building on the investments, the President made in fraud fighting in last year's budget, he will request $561 million in the 2011 budget, an 80 percent increase in discretionary funds to support programs like the Strike Forces, which are realizing impressive results by prosecuting criminals and returning dollars back to the taxpayers. And we're adding new programs to strengthen our ability to prevent fraud from ever occurring.

This is a personal priority of the President's and a personal priority of mine. When American families are struggling to make every dollar count, we need to be even more vigilant about how their money is spent.

But for these resources to have the biggest impact, we'll have to combine them with the best strategies. That's where this Summit fits in. Today is an incredible opportunity for some of our leading experts to learn from their peers in the private sector and vise versa. We'll have a chance to swap best practices for screening providers and analyzing claims. We'll also be able to discuss trends in suspicious claims and emerging fraud hotspots. Most important, I hope that we'll begin to develop the relationships that can be the basis of long-term cooperation between the public and private sectors. I think I speak for everyone in this room when I say: we're willing to work with anyone if it helps us keep patients safe, lower health care premiums, and secure Medicare for the generations to come.

When we took office a year ago, we saw that the old way of fighting fraud wasn't working. Our resources weren't keeping up with the problem. Our technology wasn't keeping up. The criminals who committed health care fraud were getting organized, but our response was often still fragmented among departments that didn't have easy ways to share information with each other. As you heard from President Obama last night, these are exactly the kind of tough problems that this administration is committed to taking on.

When we see an opportunity to safeguard Americans' tax dollars, or protect Medicare's future, or ensure patients get the right treatments, we're going to act. And when we act, we won't be afraid to make hard choices, break down silos, use new technologies…and yes, find new partners. And speaking of new technologies, I should also mention that to get the latest on how we're fighting health care fraud, you should go to our new website: stopmedicarefraud.gov.

The last thing I want to say is that this is the first national health care fraud summit, but I hope it will not be the last. One thing we know about the criminals who commit fraud is that they are not complacent. They are always probing our health care system for its weak points and coming up with new schemes to exploit them. So if we are going to defeat this national problem, we need to be just as active, creative, and determined as they are. I think this conference is a huge step in that direction.

So I want to thank all of you again for traveling from every part of the country to be here today. I hope we have some productive discussions and that everyone leaves with at least a few new ideas. And no matter what details are in the strategic plan that comes out of this summit, I can already tell you that the message for the criminals who steal from our health care system is going to be clear: your days are numbered.

And now, to talk more about this unprecedented gathering and our efforts to fight fraud in the federal government, I'd like to introduce my partner in the fight against health care fraud, Attorney General Eric Holder